**UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JERIANN JALOZA,<br><br>                   Plaintiff,<br><br>     -against-<br><br>CITY OF NEW YORK; DAVE CHOKSHI, in his individual and official capacity; BILL DE BLASIO in his individual and official capacity, ERIC ADAMS in his individual and official capacity, ERIC EICHENHOLTZ, in his individual and official capacity; STEVEN BANKS, in his individual and official capacity; JACKIE BRAY in her individual and official capacity; JAY VARMA in his individual and official capacity; and the NEW YORK CITY DEPARTMENT OF EDUCATION.<br><br>                 Defendants. | Case No.: 1:26-cv-02392-JRC<br><br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

By and through their undersigned attorneys, Plaintiff alleges as follows:

**INTRODUCTION**

1. Plaintiff Jeriann Jaloza ("Mrs. Jaloza") seeks relief from religious discrimination she faced as a result of seeking accommodation from the City's Covid-19 vaccine mandate.

2. The Mandate allowed for religious exemption, but Defendants elected to use discriminatory criteria to narrow who was eligible based on which religion and which sincere beliefs they held.

3. Mrs. Jaloza was a tenured teacher with nearly twenty years of service at the New York City Department of Education ("DOE") when she was denied religious accommodation, placed

1

on leave with significantly reduced pay for over a year and eventually terminated in December 2022.

4. During her initial hearing in 2021, an arbitrator and DOE representatives told Mrs. Jaloza, to her face, that though the found her to have sincerely held religious beliefs, she could not be accommodated because the City did not allow accommodation of Catholics or consider abortion based religious objections valid.

5. Meanwhile at least one hundred and sixty-five others whose beliefs were deemed to qualify under the original policy were accommodated, including classroom teachers.

6. After the Second Circuit held that the initial religious accommodation process and denials were likely unconstitutional in November 2021, the City of New York promised to provide a "fresh review" by a newly formed "Citywide Panel" controlled and operated by the Mayor's office, and run by Defendant Eric Eichenholtz and the City's Law Department, to reinstate with back pay any employee who qualified for accommodation under "lawful" statutory and constitutional standards.

7. Mrs. Jaloza was informed by DOE and the Citywide Panel that she would get a fresh review on November 30, 2021.

8. But the Citywide Panel failed to provide any fresh decision for over a year.

9. Instead, Mrs. Jaloza was harassed, retaliated against, denied leaves that she was entitled to as a disabled tenured teacher, and ultimately terminated without any remedial review on or about December 8, 2022, when DOE issued an ultimatum: resign or get vaccinated in violation of your sincerely held religious beliefs.

10. By that time, it was beyond dispute that vaccination could not provide protection from infection or transmission and the Centers for Disease Control had long since updated their

website to advise that employers refrain from treating vaccinated and unvaccinated employees any differently.

11. Mrs. Jaloza is entitled to relief under the Second Circuit's holding in *Kane v. de Blasio,* 19 F.4th 152 (2d Cir. 2021), in which the Court held that the Stricken Standards, pursuant to which she was originally denied accommodation, were not neutral or generally applicable and the City failed to offer any defense that could justify them under strict scrutiny.

12. Plaintiff is also entitled to relief under the Second Circuit's holding in *New Yorkers for Religious Liberty, Inc. v. City of New York* ("NYFRL"), in which the Court held that NYFRL plaintiff Natasha Solon asserted viable constitutional claims because like Jaloza, she was never provided with the remedial "Citywide Panel" review, and instead was forced to vaccinate or be terminated without having received a decision under a lawful process.

13. This case also involves extensive evidence of religious discrimination that exceeds the scope of the facts before the court in *Kane* or *NYFRL*, revealing that the mandates themselves were tainted by animus and leading to individual claims against personal capacity policy makers.

14. For example, the City improperly withheld emails from September 2021 showing that high level City operatives conspired to get arbitrators to categorically reject religious objections to abortion, even though they knew there was a connection. Pursuant to this scheme, the Commissioner of Health, Dave Chokshi, issued a letter drafted by high level City policy makers, instructing arbitrators and others to reject religious concerns about abortion, particularly when raised by Catholics.

15. Mrs. Jaloza, a devout Roman Catholic whose religious objection is grounded in her sincere religious opposition to abortion, was directly impacted by this scheme.

16. Mrs. Jaloza asserts claims against all Defendants under the Free Exercise Clause,

3

Establishment Clause and Equal Protection Clause and against the individual defendants under the aiding and abetting clause of the New York State Human Rights Law ("NYSHRL").

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

18. Venue is proper in this District under 28 U.S.C. § 1391(b).

## PARTIES

19. **Plaintiff JERIANN JALOZA** is a disabled individual who resides in Nassau County, New York. Prior to being denied religious accommodation, Mrs. Jaloza was a tenured teacher at an elementary school in Queens, New York at New York City Public School 33. She was employed by Defendant New York City Department of Education ("DOE") until she was given the ultimatum to resign or be vaccinated against her religious beliefs on December 8, 2022 and subsequently terminated for failing to capitulate. Mrs. Jaloza is one of thousands harmed by Defendants' discriminatory religious accommodation policies.

20. **Defendant CITY OF NEW YORK** is a municipal corporation of the State of New York and can sue and be sued. The City operates and employs people through its municipal agencies. Since 2002, the City has exercised Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

21. **Defendant New York City Department of Education ("DOE")** is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all

4

five boroughs of the City of New York. The Mayor of the City of New York exercises mayoral control over the DOE.

22. **Defendant DAVE CHOKSHI** was, at all times relevant herein, the Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH"). In that capacity, Chokshi exercised final policymaking authority over the mandates and decisions thereunder as well as public health guidance issued by DOHMH, including guidance directed at officials adjudicating DOE employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. He is sued in his individual and official capacities.

23. Defendant **BILL DE BLASIO** was the Mayor of the City of New York when the Mandates were adopted and implemented in 2021. In that capacity, de Blasio exercised final policymaking authority over the City's COVID-19 vaccine mandates and the policies governing religious accommodation requests submitted by DOE employees. De Blasio publicly endorsed and enforced discriminatory criteria that categorically disfavored certain religious beliefs and denominations, including objections grounded in Catholic teachings regarding abortion and aborted fetal cell lines, and personally affirmed the City's involvement in establishing the standards used to adjudicate religious accommodation requests. He is sued in his individual and official capacities.

24. Defendant **ERIC ADAMS** was, at all times relevant herein, the Mayor of the City of New York beginning January 1, 2022, and successor to the policies, practices, and enforcement mechanisms established under the prior administration concerning the COVID-19 vaccine mandate and religious accommodation process. In that capacity, Adams exercised final policymaking authority over the continued enforcement of the vaccine mandate, the

5

operation of the Citywide Panel purportedly established to provide remedial review of denied accommodation requests, and the policies resulting in the termination of employees who remained unvaccinated due to sincerely held religious beliefs. Despite representations that affected employees would receive lawful and individualized reconsideration of their accommodation requests, Adams and his administration continued the discriminatory policies and failed to provide Plaintiff with the promised remedial review before she was forced to resign or face termination. He is sued in his individual and official capacities.

25. Defendant **JAY VARMA** was, at all relevant times, a senior public health official for the City of New York, including serving as Senior Advisor for Public Health in the Office of the Mayor. In that role, Dr. Varma was a key architect of the City's COVID-19 response and played a central role in the development, implementation, and oversight of the vaccination mandate and related policies governing religious exemption requests. Acting under color of state law, Dr. Varma participated in, coordinated, and/or approved policies and practices that directed how such requests were evaluated and denied, including the standardized framework challenged in this action.

26. Defendant **JACKIE BRAY** was at all times relevant herein, the Deputy Executive Director of the NYC COVID-19 Test & Trace Corps, operating from the Office of the Mayor of the City of New York. In that capacity, Bray coordinated City Hall's involvement in developing and approving guidance directed at officials adjudicating DOE employee religious accommodation requests under the September 2021 COVID-19 vaccine mandate. She is sued in her individual and official capacities.

27. **Defendant STEVEN BANKS** was, at all times relevant herein, the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations

6

("OLR"). In that capacity, Banks exercised authority on behalf of the City over the negotiation and administration of the accommodation process applicable to DOE employees under the September 2021 COVID-19 vaccine mandate, including coordinating with various high level City policy makers, arranging policy and strategy with the unions and arbitrators, advising on criteria used at all phases of the DOE religious exemption process, and directing the development of guidance used by officials adjudicating religious accommodation requests. He is sued in his individual and official capacities.

28. **Defendant ERIC EICHENHOLTZ** was, at all times relevant herein, a senior attorney at the New York City Law Department exercising policymaking authority over employment policy and litigation and religious accommodation policies related to the September 2021 COVID-19 vaccine mandate. In that capacity, Eichenholtz directed and advised on the criteria proposed to arbitrators for adjudicating DOE employee religious accommodation requests, provided advice and oversight over the initial religious accommodation process at DOE and created and supervised the Citywide Appeal Panel. He is sued in his individual and official capacities.

## FACTUAL ALLEGATIONS

### I.    The Pandemic and the City's Vaccine Mandates

29. In March 2020, New York State declared a statewide emergency due to the Covid-19 pandemic.

30. Contrary to Defendants' frequent assertion, New York City's vaccine mandates were *not* an "early pandemic measure" but instead were introduced at least a year and a half after the pandemic began.

31. Defendant Chokshi did not announce the DOE mandate until August 2021, two months after

7

then-Governor Andrew Cuomo declared that the pandemic emergency was officially over in June 2021.

32. When the mandate was implemented, DOE teachers had already been back working in person with students in DOE schools for over a year. DOE schools were closed from March through June 2020. But by the fall of 2020, in person learning resumed and teachers were required to work in person unless granted accommodation.

33. Vaccines became available to teachers in December 2020. But teachers, including Plaintiff, were not required to take them. Instead, Plaintiff was allowed to test weekly in lieu of vaccination, as every other school district in the state allowed throughout the entire pandemic.

34. In August late 2021, Defendant Chokshi, then commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH") announced that the testing option would be removed effective September 27, 2021 (later moved to October 4, 2021).

35. At that time, it was well-established that vaccines could no longer prevent against infection and transmission to any meaningful degree against the emerging Delta and Omicron variants and that natural immunity provided superior and more durable immunity.

36. Mrs. Jaloza had natural immunity at the time the Mandate went into effect.

**II.    DEFENDANTS ADOPT A DISCRIMINATORY ACCOMODATION PROCESS**

**A.   Litigation and Labor Disputes Forced Defendants to Allow Accommodation**

37. The DOE Mandate did not originally provide for religious or medical exemptions but was amended to specifically provide such accommodation as a result of lawsuits and labor disputes.

8

38. On September 14, 2021, in litigation brought by sixteen labor unions, Justice Laurence Love issued a Temporary Restraining Order ("TRO") enjoining enforcement of the August version of the DOE Mandate because it failed to provide for religious and medical exemptions.

39. On or about September 15, 2021, Defendant Chokshi issued a new version of the DOE mandate which stated: "**Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law**."

40. Justice Love dissolved the TRO the next day "solely" because the City's promised that this new version would allow for reasonable religious and medical accommodation and they had amended the DOE Mandate to so state.

## B. Arbitration Compels Religious Accommodation and Allows for Use of "Stricken Standards"

41. In parallel labor proceedings, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse against the City and the DOE. On September 10, 2021, an arbitrator, Martin F. Scheinman issued an order that required both the City and DOE to permit religious exemptions to its DOE vaccine requirements. Identical orders were issued for DOE employees covered by other unions (collectively referred to as the "Impasse Order.")

42. Nothing in the Impasse Order, any of the DOE contracts or the awards waived the right of employees to file lawsuits for civil rights violations arising out of the order.

43. The Impasse Orders directed the City as well as the DOE to provide religious accommodation from the Covid-19 vaccines, regardless of any assertion of "undue hardship."

9

44. They provided that the City and DOE could use either the criteria and expedited process set forth in the order, or "any statutory reasonable accommodation process" to decide who to accommodate.

45. The criteria and expedited process set forth in the Impasse Orders is referred to in this and other litigation as the "Stricken Standards."

46. On their face, the Stricken Standards singled out Christian Scientists for favor and categorically excluded most other faiths through various unconstitutional limiting criteria.

47. First, the Stricken Standards imposed a clergy requirement, stating that any request "must be documented in writing by a religious official (e.g. clergy)." Thus, anyone with personally held religious beliefs or beliefs not shared by their clergy was excluded. Lest there be any doubt, the policy also specifically disqualified anyone with personally held religious beliefs.

48. Second, accommodation was only available to those who belonged to "established" and "recognized" religions, the definition of which was left up to arbitrators and DOE representatives.

49. To the extent that DOE evaluators decided an employee belonged to a "recognized" and "established" religious organization, and the employee presented a clergy letter, the applicant would still have to be denied "if the information was available online." In other words, if the church placed a description of their ministry online, the person would be denied an exemption.

50. Additionally, if an applicant did happen to belong to an "established" and "recognized" religious organization that is hierarchical and provided letters from clergy in support and the Church that did not make their views known online, that person would still have to be

10

denied if any "leader" of that person's "religious organization" had ever spoken publicly in favor of vaccination.

51. In the press conference the day before the arbitrations began, Mayor de Blasio specifically identified Catholics as ineligible under this policy because Pope Francis was vaccinated and had allegedly told him that "nothing in scripture" forbade vaccination.

### C.  The City and DOE's Implementation and Enforcement of Discriminatory Standards

52. In an early preliminary injunction appeal in 2021, the Second Circuit afforded the City with the inference that the Mayor's comments expressed merely personal beliefs but not official policy. This complaint provides evidence that the inference should go the other way, particularly on any dispositive motion where inferences are to be afforded to the Plaintiffs.

53. It is now known that both the City and DOE were liable for the implementation of the Stricken Standards against Plaintiffs and their colleagues.

54. Since 2002, the City has exercised Mayoral control over the DOE.

55. Moreover, both the City and DOE were parties to the arbitrations and bound by it to the extent it was not in conflict with the law.

56. The Impasse Orders also imposed a non-delegable duty on *both* the City and DOE to provide religious accommodation to DOE employees and stated that as "an alternative to any statutory reasonable accommodation process, the City" (and DOE) could use the criteria and process set forth in the arbitration order or any other statutory process.

57. The City and DOE could have followed the Impasse Order by implementing and endorsing lawful statutory accommodation policies, as the award stated that the City could use either the Stricken Standards or any other statutory process.

11

58. Instead, each chose to adopt, endorse and enforce the "Stricken Standards" which were facially discriminatory and failed to offer any non-discriminatory option for Catholics like Jaloza who were per se ineligible under the Stricken Standards.

59. The City proposed the bulk of the discriminatory religious accommodation criteria in the Stricken Standards.

60. The City's proposed criteria for what constitutes a "valid" religious belief, which the arbitrator adopted, were facially discriminatory. Defendants knew or should have known these criteria were illegal. At the time they were imposed, this Circuit's precedent had already recognized for decades that a clergy certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have religious beliefs that differ from those of their priest or church leadership. And the Supreme Court and this Circuit had repeatedly clarified that personally held, unorthodox, and idiosyncratic beliefs were protected, and that the government is not entitled to deny accommodations by contesting whether an adherent is correct about the factual underpinnings of her beliefs.

61. Not only did Defendants propose and choose to use the Stricken Standards instead of lawful standards, but, at every step, the City and DOE, in coordination with the individually named Defendants, publicly endorsed the standards and enforced the Stricken Standards policy in a way to maximize the burden on religious applicants and deny as many applicants as possible, typically through instructions to categorically reject whole swaths of sincerely held protected faith.

62. Upon information and belief, Defendants Attorney Eichenholtz and Steven Banks approved and/or proposed some or all of the discriminatory criteria adopted in the Stricken

Standards and advised the City on how to implement it.

63. Eichenholtz was, at the time, a senior policy maker in the Law Department, overseeing the City's employment litigation and policy. When asked if he participated in drafting or recommending the Stricken Standards criteria to Arbitrator Scheinman, he said that was privileged and he could not answer. But he later admitted that he was at least asked for his advice during this process.

64. Given that Eichenholtz continued to implement and direct employees to continue using many of the unconstitutional criteria when he oversaw the City's "remedial" Citywide Panel reviews after the Second Circuit found the first process unconstitutional, it is a reasonable inference that Eichenholtz' advice was supportive of using the discriminatory criteria.

65. Banks was the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations ("OLR"). In that capacity, Banks was the City's chief policy maker and representative in the arbitration process.

66. Recently disclosed emails show that Banks was actively attempting to find even more ways to justify categorical rejections of sincerely held religious beliefs not covered by the Stricken Standards, such as working with Commissioner Chokshi to instruct arbitrators to also categorically reject certain types of beliefs, like sincere religious objection to abortion, leading to a reasonable inference that he supported the original policies as well.

### III.    PHASE I IMPLEMENTATION – THE AUTOGENERATED BLANKET COMPUTER DENIALS.

67. From the time the religious accommodation policy was announced, Plaintiff and her colleagues were given just a few days to prepare an application, which DOE instructed had

13

to comply with the Stricken Standards criteria and required the attachment of a clergy letter or it would be denied.

68. All applications had to be submitted through the SOLAS portal. Widespread crashes and other issues with the system prevented many employees from applying through SOLAS on time. Some employees were not alerted that there even was a deadline.

69. Despite these roadblocks, Plaintiff was able to submit her applications on time through SOLAS alerting DOE that she has sincerely held religious beliefs in opposition to the vaccines and required accommodation.

70. She was immediately denied accommodation through an autogenerated email from "solas_donotreply" stating: Your application has failed to mee the criteria for a religious based accommodation. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations. This application was reviewed in accordance with applicable law as well as the [Impasse Order]. Under the terms of this order, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice…"

71. This same email was sent to all applicants without any individualized review including employees who already worked fully remotely.

72. Multiple misstatements are contained within the autogenerated initial denials. For example, as Defendant Eichenholtz later testified (in his capacity as the City's 30(b)(6) witness), the Commissioner had by that date amended the mandate to clarify that the Mandate did not

14

prevent DOE employees from receiving religious or medical accommodations to work remotely or in person with students, in school buildings or elsewhere.

73. Moreover, pursuant to the arbitration process, the City, the Union and the DOE had already set up a comprehensive plan to accommodate thousands of DOE employees at remote worksites and through various re-assignment or remote assignment positions. These worksites were largely sitting empty throughout the months the Mandate was in effect.

74. To maximize the denials, the City and the DOE did not even follow the few portions of the Impasse Orders that benefitted employees. For example, the one compromise that the Stricken Standards made in favor of religious employees was that for those lucky few who met all the unconstitutional criteria for a qualifying religious belief, those employees "shall be permitted the opportunity to remain on payroll" by utilizing the reassignment and remote worksite plans without any carve out or mechanism for denial based on undue hardship.

75. But, in the initial review, within hours of receiving each application, the DOE system issued autogenerated denials to every single applicant denying each application and, stating vaguely, that the applicant did not "meet criteria" and any accommodation would be an "undue hardship" or "more than a minimal burden."

76. At the bottom, the autogenerated emails each stated that the denials had been made in accordance with the Stricken Standards <u>and</u> other statutory accommodation laws.

77. What Defendants did is they took the most discriminatory parts of the Impasse Order (the City's discriminatory criteria) and combined them with a blanket denial because of "undue hardship" using Defendant's interpretation of an unlawful "de minimis" hardship standard that was impossible to meet.

15

78. The Impasse Order stated that if it were being used, it was the "exclusive" method to be used for accommodations requesting accommodations at the remote cite locations negotiated in the arbitration proceeding for employees accommodated under that process.

79. So, the hybrid decisions violated the Impasse Order and also failed to comport with the law. At all times relevant to these proceedings, Defendants were required at minimum to prove "significant hardship or expense" not de minimis hardship.

80. Defendant Eichenholtz refused to correct the undue hardship standard, even though he and the City and DOE defendants were promptly notified in the fall of 2021 that they were using the wrong standard through the *Kane* lawsuit and multiple other channels.

81. Eichenholtz, the City and DOE instead continued to use the "de minimis" standard throughout the first reviews and even in the remedial reviews that Eichenholtz later supervised after the Second Circuit struck held the first DOE process was unlawful throughout 2022.

82. Eichenholtz, the City and the DOE took the position that under the "de minimis" burden they were willfully applying in error, any effort whatsoever was assumed to be too great to meet this low threshold so no analysis or evaluation was necessary before tacking on an "undue hardship" reason for denial.

83. The denials did not meet the significant hardship or expense standard applicable under the NYSHRL and NYCHRL.

84. Neither the DOE nor the City ever engage in an individualized analysis of the required enumerated statutory factors or any economic or safety factors under any of the controlling accommodation statutes before denying relief.

85. In fact, decision-makers at DOE admitted in sworn testimony that no one even reviewed the applications before sending out the blanket bad faith denials.

86. 100% of applicants including Mrs. Jaloza were thus denied, even those who had already been approved to work entirely remotely or whose jobs were remote.

87. The highest decision-makers at the City, including Eichenholtz, Banks, and then-Mayor de Blasio, were aware of that DOE was sending autogenerated denials and failing to apply lawful standards.

88. Despite the City's concurrent responsibility to ensure that lawful religious accommodation was provided to DOE employees, the Mayor and others like Banks and Eichenholtz encouraged and condoned this breach of duty and failed to intervene to correct it or train DOE employees to correct the breaches.

## IV.    PHASE II – THE ARBITRATION HEARINGS UNDER THE STRICKEN STANDARDS.

89. After receiving their autogenerated denials, DOE applicants were given one business day to file an appeal with the SAMS arbitration firm, which provided the exclusive method of appeal, and which required conformity with the Stricken Standards.

90. Arbitrators had complete discretion whether to grant a zoom hearing or just automatically deny an applicant, and either way, they did not have to document any reasons for their decisions other than writing an "x" next to the word "denied."

91. No records were kept to notate the reason that any particular employee was provided with a hearing or denied or accepted.

92. Mrs. Jaloza timely appealed and had a zoom hearing with DOE representatives, and an arbitrator.

17

93. In the hearing, Mrs. Jaloza was harassed, denigrated and demeaned. First, she was told she could not be accommodated because she is Catholic. When Mrs. Jaloza expressed her confusion, the arbitrator mocked her, saying that she was violating the instructions of her "leader" Pope Francis and that she did not understand her obligations as a Catholic.

94. Mrs. Jaloza tried to explain the Catholic Catechism of the conscience and that as a Catholic she is required to follow the dictates of her religious conscience over the advice of any person, even Pope Francis. She explained that she believes that abortion is a sin, she consulted her conscience through prayer and reflection, and that she sincerely believes that she cannot take the Covid-19 vaccines as a result, since they all used aborted fetal cell lines to come to market and benefitting from that would violate her covenant with God.

95. Both the arbitrator and the DOE representative acknowledged they had no doubt she was sincere but each explained that the City's policies did not allow for accommodation of Catholics or abortion based religious concerns.

96. The arbitrator explained to her that though she was sincere, she was clearly wrong about what her faith required of her and about the connection between the vaccines and abortion.

97. At no time did anyone raise the issue of undue hardship as a reason to deny her relief.

98. Shortly after her hearing, on November 3, 2021, Mrs. Jaloza received a determination that her application for religious accommodation was denied, with no further explanation than an "x" next to the word "denied." She was then placed on leave without pay.

99. Mrs. Jaloza's denial was not an aberration. As detailed in this and the next section, the City adopted an official policy, passed on to the arbitrators and DOE, that Jews, Catholics, Muslims, Buddhists, most Christian sects (other than Christian Scientists and Jehovah's

18

Witnesses), and many other faiths were categorically barred from accommodation under the Stricken Standards and that abortion based beliefs were categorically ineligible.

100. During the arbitration reviews, the DOE zealously argued for these discriminatory policies. For example:

   a. DOE representatives repeatedly admitted that DOE took the official position, in accordance with the City's instruction, that all Jews, Catholics, Muslims, Buddhists and most Christians were per se ineligible for accommodation based on the (often erroneous) assertion that the leaders of these faiths were vaccinated.

   b. In the hearings, DOE representatives and arbitrators repeatedly accused applicants of, essentially, being heretics or wrong because the Pope was vaccinated and he was, in their view, the authority for most Christians. This argument was levied at Catholics, but also at non-Catholics. DOE even asserted that a Buddhist with sincerely held religious beliefs had to be denied because his views allegedly were out of accord with Pope Francis.

   c. City officials, DOE representatives and arbitrators also stated openly that people with personally held religious beliefs, or who did not have a clergy letter, *had* to be denied even if they were sincere.

   d. Those who expressed concerns about abortion were often told to their face that their beliefs, even if sincere, were wrong and were in any event categorically ineligible.

101. Arbitrators exercised enormous discretion about whether to follow the City's policies in this process, however. For example, one of the *Kane* plaintiffs, Amaryllis Ruiz-Torres, was told during her arbitration that many arbitrators took the position that non-denominational Christians were ineligible under the Stricken Standards, but Ms. Ruiz-Torres' arbitrator said he was

19

deviating from that position because as a Southerner, he knew that some non-denominational churches were valid.

102. Defendants admit that at least 165 employees were accommodated and remained accommodated throughout the Mandate through the arbitration process, and asserts that some arbitrators used their discretion to accommodate even Catholics and Jews.

103. The Second Circuit held that this evidence of discretion defeated general applicability of the religious accommodation process.

104. Because of Defendants' discriminatory treatment and policies, however, the vast majority of applicants, including Mrs. Jaloza, were denied again, with no official explanation other than an "x" next to the word denied.

## V. THE CITY PARTICIPATED EXTENSIVELY IN THE RELIGIOUS DISCRIMINATION DURING PHASE I AND II AT DOE.

105. The City participated extensively in the discrimination at DOE. Some examples follow:

### A. The Chokshi Letter

106. A significant fact that contributed to the discrimination (which was not before the Second Circuit in the *Kane* or NYFRL litigation), was that Commissioner Chokshi himself wrote and disseminated a letter instructing the DOE and arbitrators to deny religious objections based on a concern about the use of aborted fetal cell lines and other improper advice.

107. In the letter, Commissioner Chokshi particularly instructed decision-makers to deny religious beliefs based on an objection to the vaccines' connection to abortion.

108. Though he stated it in a manner that was intentionally confusing, and led many decision-makers to beliefs there was no connection between abortion and the vaccines, Commissioner Chokshi led with a statement insinuating no connection but buried an

admission in the letter that cell lines from aborted fetuses were technically used in the development of the vaccines, either directly (for example to make tissues to grow the adenovirus used in one of the vaccines) or for safety and efficacy testing required pre-licensure.

109. Nonetheless, Chokshi asserted in his letter that religious objection was still unwarranted because "[a]n array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development."

110. Commissioner Chokshi also claimed that other products, like Tylenol, used aborted fetal cell lines the same way and suggested that no one could therefore have sincerely held objections to the vaccines because these products were so widespread.

111. The Chokshi letter contains a number of material misrepresentations, as set forth in more detail in the next section.

112. The government is prohibited from taking sides in religious disputes or lending their power to resolve such disputes, favor one side or punish another. Commissioner Chokshi's letter did all three.

113. Commissioner Chokshi sent this letter to the DOE and also to the arbitrators hearing the appeals. The same letter was then later sent to the Citywide Panel, which also relied on it, as evidenced by the denial of Sarah Buzaglo, who was denied by the Citywide Panel on the ground that her concerns about abortion conflicted with guidance from Commissioner Chokshi.

114. DOE representatives and arbitrators cited Commissioner Chokshi's letter as authority for denying accommodation to employees who had concerns about the use of aborted fetal cell lines in production or development of the vaccines, even in cases where they found the employee's religious objections sincere.

115. Chokshi's letter directly resulted in Mrs. Jaloza's denial.

**B. Emails Showing High Level City Policy Makers Concocted and Coordinated the Promulgation of the Chokshi Letter**

116. Emails disclosed for the first time in March 2026 as a result of an appellate court order to unredact them, show that Chokshi's letter was concocted by high level City policy makers and intentionally disseminated to advise and assist arbitrators in discriminating against sincerely held religious beliefs that included "tainted" blood or abortion concerns.

117. The recently disclosed emails were initiated by Steven Banks, First Deputy Commissioner & General Counsel for the NYC Office of Labor Relations ("OLR"), who represented the Mayor and the City in all labor relations with unions. A true and accurate copy is attached hereto as Exhibit 1.

118. On September 20, 2021, just before the start of the DOE religious accommodation arbitrations, Banks commenced the chain by sending an email to a number of high-level policy makers at City Hall, and the DOHMH.

119. In Banks' September 20, 2021 email, he noted that 2/3 of appeals from the initial DOE blanket denials were religious, and many cited religious objections to abortion or certain animal products tainting the blood.

120. Defendants were already using Chokshi and the DOHMH to help deny most medical exemptions, but Banks had an idea of how Chokshi and the DOHMH could help with

22

religious exemption denials too. He said "since many of these claims are going to labor arbitrators" for appeal "it would be very very helpful if we could get a document signed off on by a City Doctor that essentially makes the argument as to why this [religious objections based on concerns about tainted blood or abortion] is BS."

121. In case there was any confusion about what this letter was to be used for, Banks concluded that the purpose would be to give the arbitrators something they could use to justify categorically denying such religious accommodation requests, which leads to a reasonable inference that the arbitration firm shared Banks' goal of denying accommodation requests and was looking for ways to shield those decisions from later challenges.

122. Jackie Bray, the Deputy Executive Director of the City's NYC Covid-19 Test & Trace Corps, and a high-level policy maker working out of the Mayor's office at the time for the City's Covid Policy and interagency coordination, agreed to try to pull together a letter by the next day.

123. Ms. Bray found a North Dakota Department of Health handout claiming religious objections were invalid and an unverified blog that was hostile to religion and falsely asserted that aborted fetal cell lines were also used to bring Tylenol and a host of other common over the counter medications to market so objectors could not be sincere. She said these would be great resources and they could use them to create something similar to provide to arbitrators from the City.

124. Bray stated "the MD's were also batting around the idea of making someone attest to rejecting all the medications on this list and look for proof that they have rejected all of these 'sincerely' for some time."

125. Bray asked Banks to send her some of the DOE employee religious accommodation letters

23

so she could craft a response that would be tailored to deny them, stating "we clearly have very good material here (citing the blog) and we also want to give you the best product we can **because this will absolutely be subject to litigation and will go far**."

126. Banks then brought in other high level policy makers and administrators from the DOE, OLR, and City Hall, asking them for help to provide some examples of DOE employee applications objecting to fetal cell lines used in the development of Covid-19 vaccines with the unmistakable message that these were to be used as models for arguments to proactively categorically refute.

127. After reviewing Brays' resources, Banks stated: "The first page of the North Dakota document is a little bit more neutral than I was thinking…We can go further and make an argument about how even if someone is concerned about fetal cells it should not prevent them from being vaccinated."

128. Banks approved Bray's idea of creating a sincerity test that resulted in disqualification if an employee did not also state that they avoided Tylenol and other products listed in the blog, stating, "Yes, the list is good. Because to the extent that there are hearings in these cases, the employees can be asked about whether they use or have used those medications."

129. Banks admitted he was coordinating with the UFT teachers union on this plan to endorse denial of certain disfavored beliefs and promised to get them the document before the arbitration hearings started later that week.

130. Once a draft was created, Dave Chokshi and Jay Varma were cc'd. Bray stated – "Attached is a memo Annie drafted. Obviously need Dave [Chokshi], Jane and Jay [Varma] to review and then need to know from OLR if this works."

131. Jay Varma said the memo was "okay with me."

24

132. Bray noted that she added a line to the draft "about pork, beef and animal products" which she needed DOHMH to confirm. She suggested that DOHMH should sign off and send to OLR, stating "We are moving fast here on negotiations and hearings on exemptions so wanting to wrap this up today." She noted that OLR also had a draft circulating.

133. Nellie Afshar, then Chief of Staff at DOHMH said she had edits. She sent a draft to Dave Chokshi, asserting that it was okay "on our side" and asking if he had "any issues with this coming from you."

134. On September 21, 2021, Defendant Chokshi wrote that he had no issues with the letter coming from him. His primary question was "We had to remove the section about pork and animal products? Seemed they wanted it specifically." Ms. Ashfar agreed to add those back in and also said she went further by "adding a line about Tylenol, advil etc" even though she knew this line was not verified as accurate. She said, "For awareness, we have not been able to verify the list of meds, I asked Jack if she could track it down with Jay."

135. Dave Chokshi thanked her with several exclamation points. Chokshi then signed off and the letter was sent to the arbitrators and DOE representatives despite the fact that the list was never verified.

136. Chokshi then disseminated the letter without further verification efforts.

137. Chokshi's letter was repeatedly cited for the line in the letter stating "the Pfizer and Moderna vaccines do not use any fetal cell lines for vaccine production." However, in the same letter, Chokshi buried the admission that all three vaccines did use aborted fetal cell lines to bring the products to market. Many arbitrators and decision-makers misunderstood the letter as saying that there was no connection. This was intentionally misleading.

138. As advised by Banks, the letter then took the position that even if fetal cell lines were

25

used, this is not a religious problem because an "array" of religious leaders advise taking the vaccine. Chokshi's letter claimed the Catholic Church had clearly taken the position that Roman Catholics were able to take the vaccine without issue though this was not true. Even the facially unconstitutional North Dakota public health handout itself did not go that far, acknowledging that the Church advised that some Catholics would not be able to take it due to guidance from their religious conscience.

139. The letter also falsely stated that Tylenol and certain other over the counter medications used aborted fetal cells to bring their products to market in a similar way.

140. The statements about Tylenol and other drugs is false and as the emails show, was knowingly unverifiable at the time.

141. Neither Bray nor Varma nor Chokshi nor Afshar ever managed to verify the list.

142. In fact, Tylenol, Advil and other products on the list were not brought to market using aborted fetal cell lines and Chokshi and the others on the email participating in the drafting of the letter had no good-faith basis to assert they did.

143. Assuming arguendo that there was any truth to Chokshi's assertion that Tylenol and other listed over the counter medications used aborted fetal cell lines the same way the Covid-19 vaccines did, it was improper for the Defendants to use that as a litmus test. They knew it was not common knowledge that any alleged connection to abortion existed for those products sufficient to put most religious people on notice to look into it. By contrast, it was widely discussed in religious circles that the Covid-19 vaccines all made use of aborted fetal cell lines to bring the products to market.

144. Because of Chokshi's misinformation, and the City's use of it, thousands of employees at DOE and the City level were denied for failing to state that they avoided Tylenol as part

26

of their religious practice, including Plaintiff.

## C. Other City Instruction to Discriminate

145. Another significant fact not before the Second Circuit was that the City, acting through its attorneys, Banks and the OLR, the Law Department (supervised by Eichenholtz) and the Department of Citywide Administrative Services ("DCAS"), provided arbitrators and DOE representatives with instructions and articles supporting their official policy to categorically exclude all Catholics, Jews, Buddhists, Seventh Day Adventists, most Christians and many others regardless of their specific objection, asserting that the "leaders" of these faiths were all in support of vaccination or the viewpoint that religious opposition to Covid-19 vaccines was not real.

146. During the arbitrations, DOE representatives and arbitrators admitted that these articles from the City and/or the Chokshi letter were a reason why applicants of those faiths were being denied accommodation.

147. For example, multiple Jewish applicants were told that they could not be accommodated, even though they had sincerely held religious beliefs, because Jews were not allowed to be accommodated under the governing policies. The adjudicators pointed to an article (sent to them by attorneys and agents for the City including DCAS) about a rabbi in Israel who was vaccinated. Even when applicants had a letter from their own rabbi and explained that Judaism is diverse and they are not bound by the views of a different random rabbi, they were told that they could not qualify because the "leader" of their faith as Defendants saw it, was the rabbi in Israel.

148. Hundreds of Christians, even non-denominational Christians like Plaintiffs, were told that they were per se ineligible because Pope Francis was vaccinated, even if the pastor of their

27

own church submitted a letter explaining that their congregation was opposed to the Covid-19 vaccines.

149. An arbitrator told Plaintiff that her religious objections, especially to abortion, were unquestionably sincere, but the City's policies did not allow him to accommodate Catholics.

150. Kane Plaintiff Ruiz-Toro was told that most arbitrators were categorically denying non-denominational Christians, but her arbitrator said he was going to grant her appeal because, as a Southerner, he knew that non-denominational churches could be valid.

151. Similar categorical denials were issued to Muslims, based on the City's provision of an article about a so-called "leader" of the Muslim faith who was vaccinated, Buddhists, based on a similar article about the Dalai Lama (even though there are thousands of sects of Buddhism and the central tenet of Buddhism for any sect is that the religion is not hierarchical), and so forth.

## VI.    Mayoral Statements Confirming Discriminatory Intent

152. DOE and the City's widespread, acknowledged policies reflected ex-Mayor de Blasio's specific guidance and admission of how the City intended to handle the applications for religious accommodation.

153. Mayor de Blasio openly endorsed the Stricken Standards policies.

154. For example, in a press briefing held on September 23, 2021, the night before the arbitration hearings began, ex-Mayor de Blasio was asked how the City would decide which DOE employees would be accommodated or not. He replied that the arbitration award "rules" were "very, very clear about what constituted the types of criteria for these exemptions." He acknowledged the City was involved in coming up with the Stricken Standards and further stated: "the ground rules were 100 percent set through an arbitration process that involved

28

the city..." He then noted that he was happily "struck at how few people applied for these exemptions" after hearing about the criteria the City set.

155. When the reporter followed up at the same September 23, 2021 press conference, asking if he could go into some of the criteria the City would use to determine who got religious exemptions at DOE, Mayor de Blasio said:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So**, we are saying** very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.

156. When the Second Circuit held in *Kane* that the record in that early case did not have facts showing the City was sufficiently involved in the DOE's accommodation process to find that the Mayor's comments were relevant on a preliminary injunction motion, the Second Circuit did not have before it the first part of the Mayor's statement to the press in which he stated: "the ground rules were 100 percent set through an arbitration process that involved the city..."

157. Nor did the Second Circuit have before it the fact that the arbitration award, on its face, ordered the City as well as the DOE to adopt and implement a religious accommodation policy, meaning the City was jointly liable and responsible for what process was chosen and how it was implemented.

158. Nor did the Second Circuit have Commissioner Chokshi's letter, the emails from high level City and Mayoral office policymakers and the Commissioner who issued the mandate himself, articles provided by DCAS (Department of Citywide Administrative Services)

encouraging the DOE and the arbitrators to categorically deny most religions, or the many other facts in this complaint that show City involvement and encouragement of the discriminatory policies originally in place at DOE.

159. Rather, the City led the Second Circuit to believe that the City was not involved in the religious accommodation process at the DOE, an insinuation that has since been clearly refuted.

160. While plaintiffs in the early cases lacked evidence of how the process worked, the last four years have yielded significant evidence of the City's direct participation and role in abetting discrimination in the DOE religious accommodation process including the role that Banks and other high level officials on the September 2021 email chain admit they played in "negotiating" with the arbitrators and UFT members long after issuance of the Impact Award to categorically exclude even more employees than the original Stricken Standards process required.

161. As set forth in the individual and general fact sections of this complaint, the City was well-aware of the discrimination going on at DOE, it had a legal responsibility through the arbitration award to make sure it did not occur and correct it when it did, and instead of correcting the problems it encouraged, directed and endorsed the discriminatory policies at DOE and then attempted to disclaim responsibility.

162. This presents a fresh record that requires a fresh determination of whether the mandates can be considered "neutral" on these facts and also whether the mayor's comments can truly be deemed "merely personal" rather than an endorsement and/or admission and/or instruction.

VII.    **Defendants Exercised Discretion to Accommodate Some Religions and Similarly Situated Individuals but Deny Others.**

30

163. The discretionary system resulted in unequal results.

164. After the arbitration appeals, most applicants were provided denials with no further explanation than an "x" next to the word "denied."

165. Defendants admit that least 165 employees, however, whose beliefs were deemed to fit within the discriminatory criteria, were accommodated and remained accommodated throughout the DOE Mandate.

166. The 165 employees accommodated under the Stricken Standards included classroom teachers as well as many others whose jobs typically involved in-person work with students as well as administrators who worked in and outside of buildings with students.

167. Defendants accommodated some teachers by providing them with co-teachers and then allowing them to teach virtually from home or one of the remote sites set up by DOE for that purpose while their co-teacher was present in the classroom with students. Others were provided with more administrative work or other shifts in job responsibility.

168. As one of many examples, an art teacher whose religious beliefs were deemed to qualify under the Stricken Standards was allowed to work from home and join her class by Google Classroom, while the DOE hired a new long-term substitute to be physically present in her classroom with the students so she could teach from afar. This art teacher was able to continue working throughout the entire mandate through this accommodation and was never terminated and thus still has her job today.

169. Plaintiff had been accommodated prior to the mandate in a similar fashion due to her disabilities. Plaintiff could have easily been allowed to teach remotely with a co-teacher at minimal expense during any acute phase of Chokshi's temporary mandate.

170. But Defendants did not bother to individually assess how much it would cost or provide any reason why they couldn't accommodate Plaintiff the same way they did other teachers whose beliefs the City found acceptable.

## VIII.    JUDICIAL RESPONSE AND SHAM REMEDIATION

### A.    The Second Circuit's Holdings in *Kane* Regarding DOE Employees

171. On November 28, 2021, on a far sparser record than this, the Second Circuit Court of Appeals held that related DOE plaintiffs in a proposed class action lawsuit (Kane v. de Blasio) were likely to succeed against the City and the DOE on free exercise claims. Specifically, the Court held that the religious accommodation policies used to implement the DOE Mandate were neither neutral nor generally applicable and that Defendants were unlikely to survive strict scrutiny, as they offered no compelling reason to engage in religious discrimination. *Kane,* 19 F4th at 167-169 (Kane I).

172. In the opinion and oral arguments, the Second Circuit particularly remonstrated Defendants for discriminating against personally held religious beliefs, conditioning access to accommodation on whether the belief was shared by so called leaders and second guessing an applicant's interpretation of what her own faith required of them.

173. Even the City's own defense attorneys, who worked under the direction of Defendant Eichenholtz, admitted in oral arguments that their religious accommodation policy was "constitutionally suspect."

174. In the Decision and Order, the Second Circuit "confirmed the suspicion" was accurate - and pointed out that Defendants had offered no excuse for the unconstitutional and discriminatory policy.

32

175. After vacating the denial of preliminary injunctive relief, the Court ordered the City to provide "fresh consideration" of all the *Kane* plaintiffs' requests for religious accommodation by a central citywide panel (the "Citywide Panel") which was to reinstate applicants with back pay if they qualified under lawful state and federal religious accommodation statutes (in accordance with the standards required by the First Amendment).

176. To avoid an order requiring broader relief, the City agreed to provide the same review to other DOE employees denied under the Stricken Standards.

**B.  PHASE III - Second Failure to Accommodate – Failure to Provide Remedial Review**

177. Despite the admission that their initial reviews were unconstitutional and the City's promise to step in and remediate, neither the City nor the DOE ever provided Plaintiff any remedial review.

178. After she was denied accommodation on or about November 4, 2021, Mrs. Jaloza's health seriously deteriorated from the harassment she faced from the arbitrators and DOE. She went on a health leave due to her worsening condition at significantly reduced pay.

179. Soon after, once the Second Circuit held on November 28, 2021 that the DOE's religious exemption policies were unconstitutional and that employees were entitled to fresh review, Mrs. Jaloza timely requested a remedial Citywide Panel review.

180. Mrs. Jaloza received notification on or about November 30, 2021 that she would get a Citywide Panel review of her religious accommodation determination.

181. However, to date, Mrs. Jaloza has received no fresh review from the Citywide Panel.

182. In September 2022, Mrs. Jaloza's leave ended. DOE kept her on the payroll but told her to remain home while her applications were pending.

33

183. Mrs. Jaloza was still waiting for a Citywide Panel determination and also had pending disability leaves and medical exemption requests supported by her treating specialists that DOE had not decided.

184. Commissioner Chokshi was involved in deciding disability accommodation decisions from the vaccine mandate and only allowed accommodation of "allergies" documented by a lab test at that point.

185. Mrs. Jaloza's medical exemption requests were denied on or about November 28, 2021 though she did submit further paperwork which was never reviewed. And she still had a restoration of health leave application pending, which she was entitled to as a tenured teacher with serious medical issues to attend to.

186. On or about December 8, 2022, while her restoration of health leave and Citywide Panel appeal were pending, Mrs. Jaloza received a letter stating that she had to either resign or get vaccinated to return to work.

187. Thus, once more, Mrs. Jaloza was forced to choose between her faith and her job. She could not get vaccinated in violation of her religious beliefs and so DOE removed her from payroll later that month and terminated her employment.

**C. Defendants' Animus Further Shown by City's Failure to Renounce Prior Standards**

188. Plaintiff never received a Citywide Panel review and should therefore be entitled to strict scrutiny as the Second Circuit already held that the process she was judged under and which was the only option made available to her was not neutral or generally applicable.

189. However, the evidence that has emerged from discovery in other cases about the Citywide Panel reviews shows further evidence that taints all level of review.

34

190. Out of about five hundred applicants the Citywide Panel claims to have reviewed, Eichenholtz admitted in depositions that the Citywide Panel only reversed and reinstated one DOE employee -- *Kane* plaintiff William Castro.

191. Upon information and belief, one other employee was also reinstated after the Citywide Panel process began. She was a classroom teacher who was allowed to go back and teach in person while the mandate was still in effect.

192. Mr. Castro's job involved work in school buildings with students. His office was in a school building. Yet, the Citywide Panel did not claim "undue hardship" for Castro but reinstated him with back pay and allowed him to be accommodated for the remainder of the Mandate, and he is still employed today as a result.

193. Notably, Castro clarified in his materials to the Citywide Panel that he did NOT rest his religious objection on the aborted fetal cell line issue, which likely helped him as he had mentioned the abortion issue as one of his reasons for religious objection in the original arbitration and that was the basis of the arbitrators decision to deny him relief.

194. Emails between Eichenholtz and Citywide Panel reviewers reveal that Eichenholtz had instructed the Citywide Panel that religious objections to abortion were not eligible and personally held religious beliefs were not eligible.

195. All DOE employees other than Castro received an autogenerated denial stating "does not meet criteria" without further explanation.

196. However, internal notes and emailed explanations sent to the *Kane* plaintiffs show that the Citywide Panel continued to apply many of the same discriminatory criteria.

197. In NYFRL, the Second Circuit reinstated the First Amendment claims of *Kane* plaintiff Heather Clark, who was denied by the Citywide Panel because her concerns about abortion

35

and guidance from prayer were deemed sincere but ineligible under the Citywide Panel's policies. The Second Circuit held that such reasoning violates the First Amendment.

198. Discovery has revealed that the discrimination that Heather Clark faced was not unique. The Citywide Panel continued, as instructed by Eichenholtz, to reject so called "personally held" religious beliefs, including those, like Clark's and Jaloza's that are derived from guidance from prayer or consultation with the religious conscience, and continued to reject applicants with religious objections to the use of aborted fetal cells like Clark and Jaloza, stating in internal notation that such beliefs, while sincere, do not qualify.

199. Defendant Chokshi also failed to repudiate his prior advice after the Second Circuit held that the original policies were unlawful. His standing instructions, which were to deny religious objections to abortion because the Pope and other leaders seemed okay with the connection, were relied upon and cited by the Citywide Panelists as well as the arbitrators.

200. Moreover, further City animus can be found in the City's failure to repudiate. Not only did the City and Eichenholtz fail to repudiate most of the discriminatory criteria in the Stricken Standards, but after the Second Circuit held they were unconstitutional in *Kane*, the City started offering the arbitration process using the Stricken Standards as an option in nearly every City department.

201. So, at most City Departments, not just DOE, a two tiered system was adopted: those that met the discriminatory criteria were entitled to accommodation under a process that allowed for accommodation without regard to undue hardship, but was facially discriminatory, whereas those that did not qualify under the discriminatory criteria had to go before the Citywide Panel, which applied a more difficult undue hardship standard.

36

202. Under the Stricken Standards, the criteria limited who could be accommodated. But, if an employee was lucky enough to meet the discriminatory criteria, or find a decision maker willing to use discretion to bend the rules, the award stated that they "shall" be allowed to remain on the payroll.

203. Thus at least 165 employees whose beliefs qualified, were accommodated and allowed to remain on payroll regardless of whether they were classroom teachers, worked in buildings with students or held any other type of position.

204. The Citywide Panel, on the other hand, allowed DOE to categorically deny those who otherwise qualified under statutory standards based on a blanket assumption that any accommodation of teachers (even those who were already remote or who had co-teachers who could handle the classroom component) was somehow enough of an effort to exceed the unlawful "de minimis" standard that the City unlawfully applied.

205. Various plaintiffs in the various lawsuits repeatedly alerted Eichenholtz and the City that the "de minimis" standard was not lawful, and they had to justify the denials under the individualized "significant" hardship or expense standard required by the NYSHRL and NYCHRL. The City ignored these warnings, which started as early as September 2021.

206. Eichenholtz was directing the religious accommodation policies and continued to apply only the "de minimis" standard throughout 2021-2023, knowing it was not the legal standard and violated employees' rights.

207. Rather than discipline him or reign him in, the City continued to champion Eichenholtz's approach, promoting him from the Division Chief for Labor and Employment, to Executive Staff as Chief Assistant Corporation Counsel for Employment Policy and Litigation in late 2021, and finally to Managing Attorney of the entire New York City Law Department,

where he is in charge of this litigation and all other litigation, overseeing the entire 850+ attorneys at the Law Department.

208. Defendant Eichenholtz was thus the final policymaker for the religious accommodation process instituted at DOE and by the City as its remediation throughout all relevant periods.

209. He also controls the litigation strategy because as Managing Attorney, he is ultimately in charge of it.

210. The City's litigation approach reveals that they continue to argue for much of the criteria from the Stricken Standards without consequence. As recently as 2025, Defendant Eichenholtz still allowed Law Department attorneys to submit briefs and other pleadings to federal courts which assert that Christians and Catholics should have their cases dismissed because Pope Francis is not vaccinated and thus they are presumptively ineligible since the leader of their faith disagrees.

211. These same arguments were submitted by the Law Department throughout the unemployment process to deny plaintiffs and others any possibility of receiving unemployment insurance.

212. Eichenholtz also managed the Law Department throughout the years that the September 2021 email chain was improperly redacted and withheld, failing to disclose this significant evidence of City and individual liability for the religious discrimination occurring at DOE.

## IX. THE "UNDUE HARDSHIP" RATIONAL WAS PRETEXTUAL AND UNSUPPORTED

### A. Similarly Situated Employees Were Accommodated Without Regard to Undue Hardship

213. A major problem with maintaining the dual track (one for those who qualify under the discriminatory Stricken Standards and the Citywide Panel process for those who don't) is that the undue hardship burden is far heavier under the Citywide Panel approach.

214. As an alternative basis for denial, the City asserted in NYFRL that it would have denied all the *Kane* plaintiffs anyway even if their beliefs did qualify under lawful standards because it was an undue hardship to accommodate employees who worked in buildings with students. This reasoning was pretextual as set forth below.

215. The Citywide Panel denials did not explain why 165 or more DOE employees who had been accommodated under the Stricken Standards, some of them classroom teachers, and most of whom worked in buildings with students, were accommodated and could continue to be accommodated while teachers with disfavored beliefs who had to go through remedial Citywide Panel review could not be. Operating from much earlier complaints, before anything was known about the Citywide Panel or its processes and outcomes, the Second Circuit did not know or consider that this two-tiered system had been created.

216. Nor did the Second Circuit review the fact that the City later admitted in depositions that the Citywide Panel never actually assessed undue hardship for DOE employees, but rather, allowed DOE to make this determination without any support, analysis or cooperative dialogue on the assumption that any hardship must be "more than a minimal burden."

217. Defendant Eichenholtz admitted in sworn testimony that the Citywide Panel was fully aware that at least 165 similarly situated DOE employees remained accommodated under the discriminatory "Stricken Standards." Crucially, he failed to proffer any non-discriminatory justification for why the DOE could sustain the burden of accommodating those 165 favored

employees while claiming that accommodating Plaintiffs—who work in the same roles—constituted an "undue hardship."

218. By allowing this capricious double standard, the City and DOE created a two-tiered system that only further entrenched the discrimination that the Second Circuit had chastised them for. 165 of those who were found to qualify under the discriminatory criteria were accommodated without regard to any alleged undue hardship. Those who appealed to the Citywide Panel were issued blanket undue hardship denials even if they already worked remotely or outside of classrooms and could easily be accommodated in person or remotely.

219. When offered as a 30(b)(6) witness, Mr. Eichenholtz admitted that neither the City nor the DOE assessed any economic factors or data to determine what it would cost in the overall budget to accommodate any employee either in the original DOE denials or at the Citywide Panel appeal level. He also admitted that the City and DOE did not assess any statutory factors on safety or any objective science before issuing undue hardship denials at any level of review.

## B. Safety Rational Was Unsupported

220. Eichenholtz also admitted that nothing in the DOE Mandate or the Municipal Mandate precluded in person or remote accommodation and at least one DOE classroom teacher was allowed to go back into the classroom and teach in person unvaccinated while the DOE Mandate was in effect. He offered no reason the same could not have been allowed for other DOE employees.

221. To the extent that Defendants argue that they had to deny Plaintiff based on "undue hardship" related to safety that is pretextual. It was well-understood before Plaintiff was terminated in December 2022 that multiple safe routes of accommodation were available.

222. By the summer and fall of 2021, prior to when Defendant Chokshi began issuing vaccine mandates, the City had already seen a substantial reduction in Covid-19 related hospitalizations and deaths compared to earlier in the pandemic. For instance, in its' own executive orders, on June 2, 2021, the City reported zero new Covid-19 deaths and a test positivity rate of 0.83%, the lowest since testing began.

223. By August 2021, even with the Delta variant surpassing prior variants, hospitalizations did not surge. A December 2021 statement from NYC Health Commissioner Dr. Dave Chokshi stated that while cases and test positivity had increased, "we have not seen the same thing with respect to the markers of severe disease, particularly hospitalizations."

224. When Defendant Chokshi announced the Mandate shortly after that statement in August 2021, it was clear from the scientific data available that vaccination could not meaningfully stop transmission or community spread. *See, e.g.,* Exhibit 3, Declaration of Dr. Risch, Yale, incorporated by reference herein.

225. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were at least equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with Covid-19 vaccines; (3) vaccine protection wanes significantly after a short period of time.

226. On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore

41

is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."

227. After the Mandate was announced, but before Plaintiffs were suspended without pay for failing to get vaccinated in violation of their sincerely held religious beliefs, two of the nation's top public health experts wrote sworn declarations that were submitted by the *Kane* plaintiffs to all the Defendants. These Declarations were submitted by Dr. Jay Bhattacharya, then at Standford and now head of the Centers for Disease Control and Prevention ("CDC") (incorporated herein by reference and attached as Exhibit 4) and Dr. Marty Makary, then at Johns Hopkins and now Commissioner of the Food and Drug Administration ("FDA) (incorporated herein by reference and attached as Exhibit 2).

228. The Declarations of Drs. Bhattacharya and Makary, citing the most up to date data and representing the best available objective science available at the time, explained to Defendants why they could safely allow DOE employees, including Plaintiff, to keep working in person unvaccinated. They offered many alternatives to exclusion, including weekly testing, rapid tests, daily symptom checks, social distancing and other measures, and stressed that natural immunity (which Plaintiff had) was repeatedly shown to be far superior and more durable than the immunity conferred by the primary vaccine series.

229. Defendant Chokshi ignored these submissions and refused to issue any updated advice to the City or DOE.

230. Defendant Varma - who was widely referred to at the time as the Mayor's "COVID Czar" – later admitted he *knew* that the vaccines were not necessary.

231. Notwithstanding his role throughout 2021 as the City's principal public health spokesperson and lead architect of the vaccine mandate, Varma admitted on video recording

42

that while he was "running the entire COVID response for the city," he personally attended large underground dance parties and sex parties with sometimes hundreds of participants, many of them unvaccinated, during the period the mandates were promulgated and in effect.

232. Varma asserts he was the one who directed Chokshi to issue the mandates.

233. This is consistent with how the Chokshi letter was issued – where Varma was asked to give final approval and Chokshi appeared to be taking directions.

234. Varma further admitted on video that the vaccine mandates were a policy of "harassment" designed to make life difficult for those who objected, and that natural immunity and testing were as effective or more effective than the mandates — facts he was aware of while simultaneously advancing the mandates and approving guidance designed to categorically deny religious accommodation requests.

235. The DOE, the City and Eichenholtz also ignored these submissions and the objective scientific consensus available at the time and continued to advise DOE to deny accommodation to those whose religious beliefs did not fit the discriminatory criteria.

236. As a 30(b)(6) witness, Eichenholtz admitted that neither the City nor the DOE *ever* assessed a single study or any data to determine if they could (or could not) safely accommodate employees in person or remotely even though the Mandate allowed for either and did not possess or review any data to refute the Declarations of Dr. Makary and Dr. Bhattacharya.

237. All other school districts in the state allowed teachers to test weekly in lieu of vaccination if they wanted to work in person with students. This included neighboring Long Island and other school districts with overlapping populations and similar safety profiles.

238. DOE was on notice that their policies were substantially underinclusive. By January of 2022, before Plaintiff was terminated, it was undeniable that the Covid-19 vaccine was not

43

stopping transmission. DOE had a daily tracker noting how many active employees had Covid-19 on any given day. Prior to the exclusion of all unvaccinated DOE employees, the numbers averaged around 40 or 50 infected teachers at any one time. After DOE employees were excluded, the numbers did not decrease but rather increased among the fully vaccinated staff. By January 2022, the fully vaccinated staff had some days where there were thousands of infected teachers on a given day. Defendants were well aware that vaccination was not stopping teachers from getting infected and passing Covid-19 on to others.

239. In or around January 2022, due to the staffing crisis caused by the exclusion of Plaintiff and other religious objectors, DOE exercised its discretion by asking *actively infected* teachers to return to classrooms but still refused to allow those with religious objections to the vaccine to return to work even though they had natural immunity and were not infected. Allowing actively infected teachers to teach the largely unvaccinated student body undermines the government's interest in stopping the spread of Covid-19 to a far greater degree than allowing uninfected teachers with religious objections to teach in person unvaccinated.

240. Moreover, under the Defendants' policies, over one million students were allowed to go to school unvaccinated every day. Even if the Covid-19 vaccine mandate could have created herd immunity (which it could not, since it did not stop infection and transmission), only mandating staff and teachers could not create herd immunity when one million students were allowed to come into the classroom unvaccinated.

241. According to Anthony Fauci, who was largely directing Covid-19 policy at the time, between 70-90% of a given population (depending on what he thought the population would

accept as the number) needed to be vaccinated to create herd immunity. The DOE mandate only covered less than 10% of the school building population.

242. Moreover, not only were 90% of the population (students) largely unvaccinated, but they rode to school each day with bus drivers who had no mandate whatsoever, and could freely transmit Covid-19 to them in enclosed busses on the way in.

243. Even if Defendants were able to show that they could not safely allow uninfected teachers with natural immunity in classrooms while their actively infected colleagues taught students in person, and over a million students were unvaccinated and driven to school by unvaccinated bus drivers, there were many accommodations short of termination available including but not limited to those suggested by Drs. Makary and Bhattacharya in the declarations that were provided to Defendants.

244. In person learning had not just started in the fall of 2021, as Defendants now try to assert, but rather had been in effect since the fall of 2020. Many teachers had been working in person with students for a year and a half when they were terminated for undue hardship. Plaintiff could have remained teaching in person and continued weekly testing, submitted daily symptom checks or the host of other accommodations suggested by the Declarations.

245. Or they could have worked remotely. Contrary to DOE's assertions, throughout the 2021-2022 school year, the DOE continued to offer remote education as an option to some students and was actively recruiting fully remote teachers throughout the school year rather than reassigning qualified teachers like Plaintiff who needed religious accommodation to do these jobs.

246. Remote work centers were set up after the arbitration award was issued, which were supposed to house any employees whose religious beliefs merited protection. However, these centers sat well-below capacity for the entirety of the mandate.

247. And, prior to the Mandate, employees had been liberally granted leave to work remotely, particularly special education employees who had co-teachers, and could also be reassigned to handle administrative tasks like writing and overseeing IEP implementation.

248. Importantly, the Mandates were always "emergency" and "temporary" in nature, and the state of emergency had to be reviewed and renewed every thirty days to justify their existence. There was no reason the same temporary accommodations could not have been granted after the vaccine mandate was in place.

249. At the very least, Defendants could have provided paid leave until employees could return, or allow employees who were on unpaid leave to pursue work outside of DOE until they could safely return, and return with seniority and tenure intact without signing a waiver of their right to challenge their denials of accommodation.

250. Instead of providing any reasonable accommodations, DOE terminated Plaintiff in December 2022, just a few months before the mandate was rescinded, for failing to get vaccinated in violation of her sincerely held religious beliefs.

## X. THE CITY ENCOURAGED RELIGIOUS DISCRIMINATION DESPITE MOUNTING EVIDENCE AGAINST MANDATES AND UNFETTERED DISCRETION.

251. At all relevant times, Defendant Chokshi and the Mayor had full discretion to repeal, amend, carve-out or pause any aspect of the Mandates or repeal them altogether. Yet despite mounting evidence that the Mandates were unnecessary, and knowledge that Plaintiff and

thousands of others needed religious accommodation, they did not amend their temporary "emergency" policies to provide relief.

252. Instead, Defendant Chokshi and Mayor de Blasio and then Mayor Adams exercised their discretion to continue to renew the "emergency" mandate every 30 days well beyond when there was any rational justification for it.

253. On March 7, 2022, Mayor Adams and Commissioner Chokshi held a press conference, each noting how low the transmission rate was in the City. Commissioner Chokshi said: "According to our data, we are currently at a low alert level" and Mayor Adams clarified the City was experiencing historically low infection rates.  The Mayor stated "I'm glad to say that the rates are low enough that the mandatory program is no longer needed." On this basis, he removed a "Key to NYC" Mandate that had required patrons to show they were vaccinated at restaurants and certain other facilities. He also stated: "As of this week, the schools' positivity rate is 0.18 percent. So I'm announcing today that we are lifting the indoor mask requirements for DOE schools between K-12 starting Monday, March 7."

254. Yet, despite the admission that the threat was abated, Defendant Chokshi and the Mayor refused to resume the weekly testing option for the DOE employee Mandate even though they knew many DOE employees were on leave without pay or significantly reduced pay as they awaited their Citywide Panel remedial review.

255. The Mayor also announced in March 2022 that he intended to lift all restrictions over parades, festivals and parties, stating: "We have become so boring as a city. I want all my parades back. Every one of them. It is time for us to enjoy our city again. All of these noes, noes, noes [sic]. We've become a city of noes. I want to become a city of excitement. We're

going to look to reinstate every parade, every festival, every block party…So if you received a no that we're not doing a parade, I need to find out why."

256. When asked by a reporter to explain how it was fair that "an unvaccinated tourist from Indiana" could go to whatever restaurant they wanted starting Monday, but an unvaccinated teacher, firefighter or EMS worker who lost their job could not, Mayor Adams did not state any public health reason, but instead said "you know, this went to court, this was the rule. How we determined fair and unfairness is in the court of law." With that, the City washed its' hands of any attempt to accommodate DOE employees unless mandated to do so.

257. When asked at a March 2022 press conference if he would repeal the employee mandates and reinstate those who were denied religious accommodation and lost their jobs now that the emergency was over, Mayor Adams again admitted the reason was not about public health, but rather animus to those who refused to comply:

> "The overwhelming number of New Yorkers, city employees did the right thing – the overwhelming number. It sends the wrong message to those New Yorkers who stated, even if i was reluctant, I'm going to follow the rules. That is what we are doing. We can't send the wrong message that when we say something, we're going to change and vacillate. That is what was stated people understood, particularly those who took the job with that understanding, we are people who took the job with the understanding and refused to comply. And so the information was clear. People have to follow the rules." https://www.nyc.gov/office-of-themayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covidmandates (last accessed June 20, 2025).

258. Neither DOE nor the City revisited any of the pending denials based on the low rates of Covid in schools in March 2022. At that time, Jaloza was still on leave and could have been accommodated rather than terminated later in the year. But she was not because she did not "follow the rules" by violating her faith in compliance with the City's mandate.

259. On March 24, 2022, Mayor Adams issued "Executive Order No. 62" (EEO 62) [ECF No. 60-2]. It amended the employee mandates with blanket exemptions for professional athletes, performers and other artists along with their make-up artists and entourages.

260. EEO 62 was entirely justified on economic rather than public health goals. The order states that these workers benefit the "City's economic recovery from the pandemic, often attracting large numbers of visitors to the City." He stated that it put athletic teams at a competitive disadvantage to bar unvaccinated players which in turn hurt the City's morale as well as economy.

261. But despite similar crushing and well-documented teacher shortages directly attributed to the Mandate, the City would not make any similar carve outs for teachers.

262. Defendant Varma, no longer employed by the City, admitted to the press that he was concerned that the new carve-outs would open the City to "legal action" on the basis that its remaining mandates were "arbitrary and capricious."

263. Furthermore, Mayor Adams knowingly allowed various City agencies to let thousands of unvaccinated employees work in person due to staffing shortages, administrative backlog, and mutual aid agreements until the Mandates were repealed in 2023, while their similarly situated colleagues were being denied religious accommodation and fired without any explanation of why they were possibly more dangerous than those allowed to keep working in person. For example, the City allowed two lifeguards, who gave mouth-to-mouth resuscitation, to work in person unvaccinated while Plaintiffs, and even remote DOE employees were denied any accommodation.

264. In *DePaola v. City of New York,* Index No. 85265/2022 (Sup. Ct. Richmond County), which is a related litigation on behalf of a New York City municipal worker who was denied

religious accommodation in November 2022, but was granted medical accommodation in May 2022, NYPD submitted a sworn affirmation from Don Nguyen, the Assistant Commissioner of the Equal Employment Opportunity ("EEO") Office admitting that by May of 2022, Covid-19 vases and deaths were extremely low, and there was no safety issue preventing accommodation (for medical or religious reasons) in person with weekly testing so the City did not feel that there was a safety issue in accommodating employees from that point on. Yet the City still maintained the DOE and Municipal Mandates knowing employees like Jaloza could still be accommodated rather than terminated.

265. In August 2022, the CDC issued written guidance stating that workplaces should not differentiate between vaccinated and unvaccinated employees, and that receipt of the primary series (all that was required by any of the Mandates) "provides minimal protection against infection and transmission."

266. On September 20, 2022, the City announced the private sector employee mandate would be repealed.

267. When asked at that time why the Municipal and DOE mandates would not also be repealed despite CDC guidance to treat all workers the same, Mayor Adams told the press, "I don't think anything in general with COVID makes sense and there's no logical pathway one can do." [sic].

268. Shortly thereafter, the Mayor admitted the City had never enforced the private sector Mandate for most (but not all) employers.

269. The Municipal and DOE Mandates were not repealed until February 2023, and then, only in an open attempt to moot the request for preliminary injunctive relief before the Second Circuit in NYFRL.

## XI.    FALL 2022 OFFER OF REINSTATEMENT AND THIRD FAILURE TO ACCOMMODATE.

270. In August 2022, around the same time that the CDC issued written guidance stressing that vaccinated and unvaccinated employees presented a comparable risk of spread, and prior to the end of Mrs. Jaloza's leave, DOE offered all unvaccinated employees their same jobs back with no break in service if they would simply get vaccinated by September 5, 2022.

271. In August and September 2022, Defendants were fully aware that Plaintiff needed religious accommodation to return to work under the new offer but despite all the evidence and guidance explaining that there was no safety barrier, DOE, acting under the direction of Eichenholtz and other City policymakers, did not grant any religious accommodation to Plaintiff, even then.

272. Most DOE employees who were denied religious accommodation and fired are still barred from returning to work due to coercive and retaliatory problem codes attached to their files, hostility and refusal to rehire, or the imposition of coercive "waivers" that they are required which would waive their right to seek redress for religious discrimination or back pay.

## XII.    SUMMARY OF MUNICIPAL LIABILITY UNDER MONELL (42 U.S.C. § 1983)

273. Plaintiff incorporates by reference all paragraphs in this section as if fully set forth herein.

274. As the complaint details, the constitutional deprivations described in this Complaint were not the result of isolated incidents or rogue employees, but were caused by official municipal policies, customs, or practices of the City and the DOE and their high level policy makers.

275. The challenged policies and practices were implemented, ratified, endorsed, directed, and perpetuated by final policymakers for the City and DOE, including the Mayor,

Commissioner of Health, senior officials within OLR, and senior Law Department policymakers.

276. Specifically, without limiting other facts referenced or which are permissibly inferenced in this complaint, the municipal Defendants are liable based on the following few examples out of many set forth here in and many more to be developed through discovery and trial:

- Express Policy (The Stricken Standards): the Impasse Order provided DOE and the City were jointly ordered to provide an accommodation process for DOE employees and to choose which policy to use to administer it. They are each liable for choosing to use and enforce the facially discriminatory "Stricken Standards" which facially discriminate amongst religions and religious beliefs. This is direct evidence of discrimination.

- Direct evidence claim: widespread statements by DOE attorneys in arbitration hearings stating that whole categories of religion and belief were ineligible and essentially wrong or heretical even if sincere. DOE and the City's failure to remediate or address despite repeated notice.

- Evidence that City agencies, the Law Department and other high level policy making entities and persons instructed DOE to discriminate against whole categories of sincere belief.

- Failure to remediate and continued use of policy after court order: the City and DOE are each also jointly liable for failing to remediate the discrimination after the parties own attorneys admitted in open court that the original process they chose was likely unconstitutional. Though the City promised the Court it would remediate

52

this harm, it did not for the Plaintiff herein and thousands of others denied under the original policy.

- Direct evidence claim: Emails from the City's highest policymakers, including the Commissioner of Health himself, show that the City colluded with the DOE, the unions, and the arbitrators to further discriminate against employees with sincerely held religious objections to abortion, Catholics, and those with objections based on purity of the blood.

- Direct evidence claim: The Commissioner of Health, who is undoubtedly the policy maker for the entire City, responded to Defendant Banks' request to craft a letter to try to categorically establish for arbitrators that these beliefs were "BS" by complying and issuing a letter that facially discriminates and has known misinformation about the connection between aborted fetal cell lines and other common medications.

- Direct evidence claim: Defendant Varma, who had policy making authority over the City's Covid-19 policies and directed the mandate participated in this decision to issue the Chokshi letter and "Ok"d the scheme. Varma also admitted that the mandates that he had been responsible for getting issued – including the DOE mandate – were not based on public health but rather a desire to harass unvaccinated people including those who could not get vaccinated for religious reasons.

- Ratification, endorsement and direct evidence claim: Mayor de Blasio, who was a final policy maker for the City, endorsed and confirmed that the City intended to deny all applications from those with personally held religious beliefs, all Catholics,

53

and most other religions other than Christian Scientists and Jehovah's Witnesses. He bragged that this policy was "100%" set by the city and the unions.

- High level policy makers, such as Eichenholtz, continued to instruct reviewers during the Citywide Panel "remediation" to reject beliefs tied to abortion or that were personally held and other criteria held unconstitutional from the original policies. DOE also applied the wrong undue hardship standard and Eichenholtz continued the use of that improper de minimis standard on appeal despite frequent notice that it was improper.

- The Joint Venture: The legal mandate of the September 10, 2021 Arbitrator's Award, which created a "joint venture" between the City and DOE, imposing a non-delegable duty on both entities to provide religious accommodation to DOE employees is binding and the failure to train or properly oversee the process to avoid widespread documented abuses from occurring or going unremediated.

- Failure to Train or Supervise: The City's deliberate indifference in failing to train or supervise DOE personnel to ensure constitutional neutrality, despite the City's direct role as a party to the joint Arbitrator's Award and repeated notice through the *Kane v. de Blasio* matter and related lawsuits, emails, and notices of claim.

### **FIRST CAUSE OF ACTION**

**(Violation of the U.S. Constitution - Equal Protection Clause)**

*Against All Defendants*

277. Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

278. Plaintiff asserts that Defendants, acting under color of state law, violated the Equal Protection Clause of the Fourteenth Amendment by adopting, enforcing, directing,

54

ratifying, implementing, and/or participating in the implementation of a facially discriminatory religious accommodation policy.

279. **Direct Evidence of Discrimination:** The "Stricken Standards" created express classifications and denominational preferences based on protected characteristics by singling out unorthodox beliefs and minority faiths for disparate treatment while specifically favoring "established" religions such as Christian Science.

280. **Lack of Neutrality:** The policy and its enforcement were not neutral or generally applicable, as City and DOE high level policy makers and administrators endorsed them and "passed judgment upon" the legitimacy of Plaintiff's religious beliefs, particularly those derived from personal prayer or concerns regarding the use of aborted fetal cell lines, all the while concocting various plans to try to ensure that certain religions (like Catholicism) and beliefs (like objection to abortion) were subjected to disparate treatment and special disability.

281. **Individual Liability of Personally Named Defendants.** Pursuant to 42 U.S.C. § 1983, individuals are personally liable for their personal involvement in these constitutional deprivations as set forth in this complaint and the statutory claim sections summarizing individual liability.

282. Monell liability is also asserted in this complaint, including but not limited to the Monell section of the complaint.

283. **Direct Discrimination Through the Two-Tiered System:** Defendants also violated Equal Protection by subjecting Plaintiff and others denied under the original scheme to a more onerous "undue hardship" standard than the 165 favored employees who were

55

accommodated without such a burden, solely because Plaintiff's beliefs did not fit Defendants' preferred religious classifications.

284. **Underinclusivity:** Defendants mandate was substantially underinclusive and allowed secular carve outs but not religious. The City's mandates were meant to function as one overall policy. The City carved out athletes, entertainers, and their makeup artists and entourages, and accommodated City lifeguards who give mouth to mouth resuscitation but declined to accommodate plaintiffs. Over one million students, equally able to catch and spread Covid-19, were allowed to attend school unvaccinated while Plaintiff was denied based on vague and unsupported boiler plate "undue hardship" assertions even though the Mandate did not require it and no Defendant assessed whether there was a safety issue or economic issue that prevented accommodation. If one million students are able to remain unvaccinated, it would not matter if 100% of the staff was vaccinated – herd immunity is impossible under those circumstances even if the vaccines could stop transmission.

285. **Strict Scrutiny:** Because the policy makes express classifications based on religion and exhibits animus, it must be subjected to strict scrutiny. Defendants cannot demonstrate that their denial of accommodation to Plaintiff was the least restrictive means of furthering a compelling state interest.

## SECOND CAUSE OF ACTION

**(Infringement of Free Exercise Clause – United States Constitution)**

*Against All Defendants*

286. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

287. Plaintiff's sincerely held religious beliefs prohibit them from receiving a Covid-19 vaccine.

56

288. Defendants, acting under color of state law, substantially burdened Plaintiff's free exercise of religion by forcing her to choose between her faith and her career and participating in discriminatory policies that infringed her religious practices.

289. Lack of Neutrality and General Applicability: The religious accommodation policies were neither neutral nor generally applicable because they allowed for a discretionary, individualized exemption mechanism and were infected by a facially discriminatory policy that favored specific religious dogmas. The author of the Mandate, who had the power to revoke or repeal it at any time, participated in the religious discrimination and failed to repudiate animus laden comments.

290. Individual Liability: Pursuant to 42 U.S.C. § 1983, individuals are personally liable for their personal involvement in these constitutional deprivations as set forth in this complaint and the statutory claim sections summarizing individual liability.

291. Monell liability is also asserted in this complaint, including but not limited to in the Monell section above.

292. Strict Scrutiny: Because the policies were not neutral or generally applicable, and were motivated by religious animus, Defendants must meet the burden of strict scrutiny. Defendants cannot demonstrate that the summary denial of Plaintiff's requests—without considering weekly testing or remote work—was the least restrictive means of furthering a compelling state interest particularly where they accommodated 165 other employees whose religious exemptions were granted and who were similarly situated.

## THIRD CAUSE OF ACTION

**(Violation of the Establishment Clause of the United States Constitution)**

*Against All Defendants*

293. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

294. Plaintiff repeats and realleges each preceding paragraph of this Complaint as if fully set forth herein.

295. The Establishment Clause of the First Amendment prohibits the government and government actors from preferencing any particular religion or religious dogma, or abridging rights to the free exercise of religion.

296. Defendants violated the Establishment Clause by expressing a preference for specific faiths and leaders while expressing animus toward those with unorthodox religious objections to vaccination.

297. Impermissible Entanglement: Defendant Chokshi and high level City policy makers colluded with the union, DOE and arbitrators to categorically deny sincerely held religious beliefs and provided instructions and letters to decision-makers and arbitrators that impermissibly took positions on religious matters, imposed special disability on certain faiths and beliefs, tried to resolve religious questions and expressed denominational preferences.

298. Denominational Preference: The DOE and the City adopted a facially discriminatory policy that favored Christian Scientists and Jehovah's Witnesses on its face while requiring discrimination against minority and unorthodox faiths. All defendants upheld and defended and endorsed that policy and some helped promulgate it.

299.  Individual Liability: Pursuant to 42 U.S.C. § 1983, individuals are personally liable for their personal involvement in these constitutional deprivations as set forth in this complaint and the statutory claim sections summarizing individual liability.

300. Monell liability is also asserted in this complaint, including but not limited to the facts set

forth in the Monell section.

301. These preferences trigger strict scrutiny, and Defendants cannot prove that their actions were narrowly tailored to further a compelling state interest.

## FOURTH CAUSE OF ACTION

### (Violation of New York State Human Rights Law –Aiding and Abetting)

*Against All New York City and Individually Named Defendants*

302. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

303. At all relevant times, Plaintiff was an employee protected by the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.

304. The NYSHRL prohibits employers from discriminating against employees on the basis of religion and requires employers to reasonably accommodate sincerely held religious beliefs and practices unless the employer demonstrates that accommodation would impose an undue hardship involving significant expense or difficulty.

305. The NYSHRL independently makes it unlawful for any person to aid, abet, incite, compel, or coerce the doing of any acts forbidden under the statute, or to attempt to do so. N.Y. Exec. Law § 296(6).

306. Plaintiff held sincere religious beliefs that prohibited her from receiving the COVID-19 vaccines. Defendants were aware of Plaintiff's beliefs and requests for religious accommodation.

307. The City and the DOE, jointly required to accommodate Plaintiff pursuant to the arbitration award, denied Plaintiff accommodation, subjected her to discriminatory treatment, deprived her of equal terms and conditions of employment, placed her on involuntary unpaid or reduced-pay leave, failed to provide lawful remedial review, and

ultimately terminated her employment because of her religion and religious practices.

308. Defendants failed to engage in a good-faith individualized accommodation analysis and instead adopted, endorsed, ratified, enforced, and perpetuated discriminatory policies and practices that categorically disfavored particular religions, denominations, and religious beliefs, including religious objections relating to abortion and aborted fetal cell lines.

309. Defendants further failed to apply the proper undue hardship standard required under the NYSHRL and instead utilized blanket assumptions, boilerplate denials, discriminatory screening criteria, and unlawful categorical exclusions.

310. Defendant City of New York and Defendant DOE are liable as employers and joint participants in the discriminatory accommodation process described herein.

311. The City and the individually named Defendants are also liable under the aiding and abetting prong of the NYSHRL. Each individually named Defendant personally participated in, authorized, directed, ratified, encouraged, condoned, incited, compelled, facilitated, and/or knowingly failed to remediate the discriminatory conduct complained of herein and is therefore individually liable under N.Y. Exec. Law § 296(6).

312. Defendant Dave Chokshi aided and abetted the discrimination against Plaintiff by (among other actions described herein) issuing and disseminating official guidance and instructions to arbitrators, DOE personnel, and City reviewers directing them to reject religious accommodation requests grounded in objections to abortion and aborted fetal cell lines, including objections commonly held by Catholics and other religious adherents. Chokshi knowingly used his authority as Health Commissioner to lend governmental and purported scientific authority to discriminatory religious determinations, approved and disseminated misinformation intended to undermine religious objections, and continued renewing the

60

mandate despite knowing that employees with sincere religious objections were being denied accommodation and threatened with termination without any public health need or real justification including as late as December 2022, when Mrs. Jaloza was fired.

313. Defendant Bill de Blasio aided and abetted the discriminatory conduct by publicly endorsing and ratifying the Stricken Standards and expressly affirming that the City established the discriminatory criteria governing DOE religious accommodation determinations as official policy. Acting as final policymaker for the City, de Blasio publicly stated that Catholics and others whose religious leaders supported vaccination would not qualify for accommodation and endorsed the exclusion of employees with personally held religious beliefs. Despite knowledge that employees were being denied accommodation on unconstitutional and discriminatory grounds, de Blasio failed to intervene or remediate the discrimination and instead encouraged and perpetuated the unlawful policies and practices.

314. Defendant Eric Adams aided and abetted the discriminatory conduct by continuing, ratifying, and enforcing the unlawful accommodation framework after assuming office as Mayor. Adams exercised final policymaking authority over the continued enforcement of the vaccine mandates, the operation of the Citywide Panel, and the refusal to reinstate employees denied accommodation under unlawful standards. Adams permitted the continued application of discriminatory criteria and unlawful hardship standards, failed to provide Plaintiff meaningful remedial review, continued enforcement of the mandates long after the purported public health justification had substantially eroded, and maintained discriminatory treatment of religious objectors while simultaneously authorizing broad secular carve-outs and exemptions for favored groups.

61

315. Defendant Jay Varma aided and abetted the discrimination by participating in and approving the development and dissemination of discriminatory guidance designed to undermine and categorically reject religious objections to vaccination, including objections relating to abortion and purity of the blood. Varma knowingly approved dissemination of misinformation and participated in efforts to use purported public health authority to suppress protected religious objections. Varma further admitted that the mandates were not issued due to public health need but functioned as a coercive tool intended to pressure and harass individuals who refused vaccination.

316. Defendant Steven Banks aided and abetted the discrimination by coordinating with City Hall, DOE officials, arbitrators, unions, and other policymakers to create, promote, and enforce discriminatory accommodation standards and strategies intended to ensure denial of broad categories of religious accommodation requests. Banks initiated and directed efforts to procure official guidance intended to characterize protected religious beliefs as illegitimate and assisted in orchestrating discriminatory policies targeting employees with objections relating to abortion and other protected beliefs.

317. Defendant Jackie Bray aided and abetted the discrimination by helping draft, coordinate, and facilitate dissemination of the Chokshi guidance and by proposing and advancing discriminatory screening mechanisms intended to disqualify religious applicants, including litmus-test style criteria designed to attack the sincerity of employees' religious beliefs. Bray coordinated among multiple City agencies and policymakers to implement and perpetuate discriminatory accommodation practices.

318. Defendant Eric Eichenholtz aided and abetted the discrimination by advising on, directing, implementing, ratifying, supervising, and perpetuating the discriminatory

accommodation process, including the Stricken Standards and the subsequent Citywide Panel review process. Eichenholtz knowingly continued use of unlawful discriminatory criteria and improper hardship standards after the constitutional defects in the accommodation process had been identified by the Second Circuit and repeatedly brought to Defendants' attention. Eichenholtz further supervised or participated in the continuation of policies excluding personally held religious beliefs and objections relating to abortion from meaningful accommodation review.

319. Defendants acted intentionally, willfully, maliciously, recklessly, and/or with conscious disregard for Plaintiff's protected rights.

320. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered loss of employment, loss of compensation and benefits, emotional distress, humiliation, reputational harm, pain and suffering, and other damages in an amount to be determined at trial.

321. Monell liability is also asserted in this complaint, including but not limited to the facts set forth in the Monell section above.

322. Defendants' conduct entitles Plaintiff to compensatory damages, punitive damages as permitted by law, equitable relief, attorneys' fees, costs, interest, reinstatement, front pay, back pay, and all other relief authorized under the NYSHRL.

**WHEREFORE,** for all causes of action pleaded above, Plaintiff prays that this Court grant judgment containing the following relief:

- Declaratory Judgments: A judgment declaring that Defendants' three distinct failures to accommodate Plaintiff—the initial denial/termination, the failure to provide remedial review, and the failure to accommodate religious beliefs in

63

connection with the September 2022 reinstatement offer—are void ab initio and violate the SHRL and the United States Constitution under the enumerated claims.

- Injunctive Relief: An order immediately reinstating Plaintiff to her former position with full seniority, no break in service, and restoration of all status, retirement credits, and benefits along with lost salary, back pay and front pay.

- Damages: An award of actual, nominal, and compensatory damages (including back pay, front pay, and pain and suffering) in an amount to be determined at trial.

- Punitive Damages: An award of punitive damages against the individual Defendants for their malice or reckless indifference to Plaintiff's state and federally protected rights.

- Interest, Costs, and Fees: An award of pre- and post-judgment interest, reasonable attorneys' fees, expert fees, and costs.

- Civil Penalties: An order for civil fines and penalties pursuant to New York Executive Law § 297(9).

- For such other further or different relief as this Court may deem just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiff demands a trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
　　　May 15, 2026

Respectfully Submitted,
Gibson Law Firm, PLLC

By:　　/s/ Sujata S. Gibson
　　　Sujata S. Gibson

64

120 E Buffalo Street, Suite 201
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

**Attorneys for the Plaintiff**